UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| |  |
|---|---|
| GORDY ANOMNACHI, <br><br> *Movant*, <br><br> v. <br><br> SOCIAL SECURITY ADMINISTRATION, OFFICE OF THE INSPECTOR GENERAL, <br><br> *Respondent*. | Misc. No. 17-2708 (TJK) |

## MEMORANDUM OPINION AND ORDER

Movant Gordy Anomnachi has filed a motion to quash an administrative subpoena issued by Respondent, the U.S. Social Security Administration's Office of the Inspector General ("SSA-OIG"), for records of a bank account that Anomnachi asserts was maintained to facilitate the payment of Social Security benefits to an incapacitated person for whom he serves as guardian. *See* ECF No. 1. Anomnachi proceeds pursuant to 12 U.S.C. § 3410(a), part of the Right to Financial Privacy Act of 1978 ("RFPA"), 12 U.S.C. §§ 3401-3422, which authorizes such challenges by customers of financial institutions. SSA-OIG submitted a response pursuant to 12 U.S.C. § 3410(b). *See* ECF No. 6. For the reasons set forth below, the Court finds that the statutory criteria for enforcement of the subpoena are plainly met here, as demonstrated by the sworn statements and other materials submitted by both SSA-OIG and Anomnachi himself. The motion is therefore **DENIED**, and SSA-OIG may enforce the subpoena.

**I.  Background**

  *A.  The Right to Financial Privacy Act of 1978*

In 1976, the Supreme Court held that the Fourth Amendment does not afford bank customers an actionable privacy interest in financial records held by their bank. *See Nicksolat v.*

*DOT*, No. 17-mc-2198 (KBJ), 2017 WL 4443410, at *1 (D.D.C. Oct. 3, 2017) (citing *United States v. Miller*, 425 U.S. 435 (1976)).  Congress responded in 1978 by passing the RFPA, which provides bank customers with certain rights when the federal government requests their records through the use of administrative subpoenas.  *See id.*  Under the RFPA, such subpoenas may issue "only if 'there is reason to believe that the records sought are relevant to a legitimate law enforcement inquiry.'"  *Id.* (quoting 12 U.S.C. § 3405(1)).  The RFPA also requires that customers be notified of such subpoenas and afforded the opportunity to challenge them in federal district court.  *See id.*  Specifically, the statute provides that a customer may move to quash an administrative subpoena seeking her bank records within ten days of service of the notice (or fourteen days if it is mailed).  12 U.S.C. § 3410(a).  If the district court finds that the motion complies with § 3410(a), it must order the government to respond and must decide the motion within seven days of the filing of that response.  *See id.* § 3410(b).

The statute instructs the court to deny the motion and order the process enforced if "the applicant is not the customer to whom the financial records sought . . . pertain" or "there is a demonstrable reason to believe that the law enforcement inquiry is legitimate and a reasonable belief that the records sought are relevant to that inquiry."  *Id*. § 3410(c).  Conversely, under the statute, the court must grant the motion and order the process quashed if it finds that "the applicant is the customer to whom the records sought . . . pertain," and either that "there is not a demonstrable reason to believe that the law enforcement inquiry is legitimate and a reasonable belief that the records sought are relevant to that inquiry" or that the government has not complied substantially with the procedural requirements of the RFPA.  *Id*.

The RFPA merely requires that there be "a good reason to investigate," *Nicksolat*, 2017 WL 4443410, at *4 (quoting *Feiner v. SEC*, 914 F. Supp. 2d 474, 478 (S.D.N.Y. 2012)), as

opposed to an "illegitimate purpose" such as harassment or intimidation, *Feiner*, 914 F. Supp. 2d at 477. As courts have noted, this legal standard is far less demanding than the one governing warrants, which requires "probable cause to believe that a crime has been committed and that evidence of the crime will be found in the place to be searched." *Nicksolat*, 2017 WL 4443410, at *4.

    B.    *Procedural History*

On October 10, 2017, SSA-OIG issued an administrative subpoena requesting records from a financial institution related to an account for which Anomnachi is a joint account holder. *See* ECF No. 1-1, at 9-12 (copy of subpoena and notice provided to Anomnachi).[1] The subpoena seeks various account records, such as correspondence, transaction records, and account opening information, dating from 2007 to 2017. *See id.* SSA-OIG provided Anomnachi with notice of the subpoena, explaining that it was investigating possible fraud in connection with Social Security benefits. *See id.*; *see also* ECF No. 6-1, at 3-4 (Declaration of Special Agent Eric Ryan or "Ryan Decl." ¶ 2). On October 23, 2017, Anomnachi filed the instant motion to quash the subpoena, and attached an affidavit with exhibits. ECF No. 1. On November 2, 2017, the Court ordered SSA-OIG to respond. On November 20, 2017, SSA-OIG did so, attaching a declaration by Special Agent Eric Ryan with exhibits. ECF No. 6.

**II.**     **Analysis**

The Court must deny Anomnachi's motion because, in light of the submissions of both parties, the record reflects (1) a demonstrable reason to believe that SSA-OIG's law enforcement

---

[1] Both parties' filings in this case contain numerous categories of information, such as bank account numbers, that must be redacted pursuant to Local Civil Rule 5.4(f). The Court has accordingly placed the filings under seal and ordered the parties to submit redacted versions for filing on the public docket. The parties have not yet complied with those orders, and so their supporting papers remain under seal as of the issuance of this Opinion.

3

inquiry is legitimate, (2) a reasonable belief that the records sought are relevant to that inquiry, and (3) substantial compliance with the RFPA by SSA-OIG.[2]

        A.        *SSA-OIG's Law Enforcement Inquiry*

SSA-OIG asserts that it is investigating "possible fraudulent activity" in connection with Social Security benefits that were improperly paid to a deceased person. ECF No. 6-1, at 3-4 (Ryan Decl. ¶ 2). The investigation has focused on two Social Security recipients with the same first and last names, one of whom is alive (the "Living Beneficiary") and the other deceased (the "Deceased Beneficiary"). *See id.* The Living Beneficiary, born in 1938, currently receives disability benefits from the Social Security Administration through the District of Columbia Department on Disability Services ("DDS"), which serves as his payee. *Id.* at 4 (Ryan Decl. ¶ 3). The Deceased Beneficiary was born in 1935 and passed away in 2003, but the Social Security Administration has nonetheless disbursed benefits for him since at least 2007. *Id.* (Ryan

---

[2] The Court assumes for purposes of its analysis that Anomnachi is, as required by the statute, a customer "to whom the financial records sought . . . pertain." 12 U.S.C. § 3410(c). Anomnachi states that he opened and operated the bank account at issue in connection with his role as guardian for an incapacitated person, and asserts on that basis that he is "not 'the customer whose records are being required by the government.'" ECF No. 1-1, at 1 (Affidavit of Gordy Anomnachi or "Anomnachi Aff.") (emphasis omitted). Anomnachi's own statement would therefore appear to provide a separate basis for the Court to deny the motion. Nonetheless, the undisputed facts contained in his affidavit appear to show that he is, in fact, a "customer" within the meaning of the RFPA. The statute defines a "customer" as "any person or authorized representative of that person who utilized or is utilizing any service of a financial institution . . . in relation to an account maintained in the person's name." 12 U.S.C. § 3401(5). Anomnachi asserts that he opened and operated the bank account in question as a joint account, with himself as one of the named account holders. *See* ECF No. 1-1, at 3-4 (Anomnachi Aff. ¶¶ 11, 14). Therefore, his status as a named account holder would appear to bring him within the ambit of the statute's definition, regardless of his relationship with any other joint account holder. In other words, he would appear to be a "person . . . who utilized . . . any service of a financial institution . . . in relation to an account maintained in [his] name," making him a "customer" to whom the financial records sought pertain. 12 U.S.C. § 3401(5).

4

Decl. ¶¶ 4-6). The two beneficiaries are assigned separate Social Security numbers. *Id.* (Ryan Decl. ¶¶ 3-5).

SSA-OIG asserts that in June 2007, four years after the Deceased Beneficiary's death, Anomnachi applied to serve as the representative payee for benefits for the Deceased Beneficiary. *Id.* (Ryan Decl. ¶¶ 4-5). Since then, SSA-OIG claims, those benefits have been paid into a bank account maintained by Anomnachi. *Id.* at 4-5 (Ryan Decl. ¶¶ 6-8). SSA-OIG further asserts that the subpoena at issue here is directed to that bank account, and is part of a legitimate investigation into the circumstances under which Social Security benefits intended for the Deceased Beneficiary were improperly paid out. *Id.* at 5 (Ryan Decl. ¶ 9).

Anomnachi sets forth his own version of the facts, corroborating SSA-OIG's assertion that he caused the Deceased Beneficiary's benefits to be paid into the account in question, but claiming that he did so unwittingly. He asserts that, in 2005, he was appointed guardian of an incapacitated person he now understands is the Living Beneficiary. *See* ECF No. 1-1, at 2 (Affidavit of Gordy Anomnachi or "Anomnachi Aff." ¶ 1); *id.* at 184 (Letter from Anomnachi to Soc. Sec. Admin. (Apr. 8, 2016)). In the years that followed his appointment, he intended to apply for a birth certificate and Social Security card for the Living Beneficiary. *See id.* at 2-3 (Anomnachi Aff. ¶¶ 3-11). In his telling, however, various government agencies committed errors that confused the identities of the Living Beneficiary and the Deceased Beneficiary during this process. *See id.* As a result, the Social Security Administration reinstated benefits intended for the Deceased Beneficiary and paid them for almost ten years into the bank account Anomnachi opened; however, once the error was discovered last year, he requested that the benefits be terminated. *See id.* at 3-6 (Anomnachi Aff. ¶¶ 10-12, 22-24); *id.* at 184 (Letter from Anomnachi to Soc. Sec. Admin. (Apr. 8, 2016)).

5

On this record, there is obviously "demonstrable reason to believe" that SSA-OIG is conducting a legitimate investigation into how the Social Security Administration came to improperly pay out these benefits. To be sure, Anomnachi asserts that he is blameless of any wrongdoing, and that these circumstances are the result of innocent errors that caused a mix-up concerning the identities of the Living Beneficiary and the Deceased Beneficiary. *See id.* at 3-4 (Anomnachi Aff. ¶ 12). He claims that he applied all the funds he received for the benefit of the Living Beneficiary, as opposed to his own personal use. *See id.* at 3-5 (Anomnachi Aff. ¶¶ 12, 17, 19). And he insists that he did not know the Living Beneficiary was already receiving other Social Security benefits through DDS, a separate payee. *See id.* at 184 (Letter from Anomnachi to Soc. Sec. Admin. (Apr. 8, 2016)). All of these claims may well turn out to be true. But they provide no basis for the Court to quash the subpoena, for surely there is "a good reason" for SSA-OIG to investigate the matter. *Nicksolat*, 2017 WL 4443410, at *4 (quoting *Feiner*, 914 F. Supp. 2d at 478).[3]

B.  *The Relevance of the Records to the Law Enforcement Inquiry*

As described above, SSA-OIG asserts that after the Deceased Beneficiary's death, the Social Security Administration improperly paid benefits intended for him into the bank account targeted by the subpoena at issue. And Anomnachi – again, as already set forth above – concedes that he opened the account into which the Social Security Administration disbursed the Deceased Beneficiary's benefits for years, although he claims to have done so only in connection with his guardianship of the Living Beneficiary, for whose sole benefit he directed those funds.

---

[3] Anomnachi also alleges that SSA-OIG is conducting the investigation for "punitive purposes." *See* ECF No. 1-1, at 1 (Anomnachi Aff.). Of course, law enforcement investigations may quite properly lead to punishment for those determined to be responsible for wrongdoing. To the extent Anomnachi asserts that the investigation is motivated by an *illegitimate* purpose, such as harassment or intimidation, he offers no facts to support his claim.

Anomnachi further admits that it was determined that the funds were being improperly paid, and that he requested they be terminated. On this record, there is no doubt that the records of the bank account targeted by the subpoena are relevant to SSA-OIG's investigation.

Anomnachi argues that the bank records are not relevant to the investigation because the subpoena issued by SSA-OIG incorrectly identifies the Deceased Beneficiary – as opposed to the Living Beneficiary – as his joint account holder. *See* ECF No. 1-1, at 4 (Anomnachi Aff. ¶¶ 13-14). The record is unclear regarding which of the beneficiaries is named on the account as Anomnachi's joint account holder. Ultimately, however, there is no discernable reason why this discrepancy, even if it exists, would nullify the demonstrated relevance of these bank records to SSA-OIG's investigation, and Anomnachi offers none.

C. *Substantial Compliance with the RFPA*

The RFPA provides that the government may obtain records by an administrative subpoena only if:

> a copy of the subpena [sic] or summons has been served upon the customer or mailed to his last known address on or before the date on which the subpena [sic] or summons was served on the financial institution together with the following notice which shall state with reasonable specificity the nature of the law enforcement inquiry[. . . .]

12 U.S.C. § 3405(2). To demonstrate substantial compliance, the government "need not set forth the specific provision of law that the customer may have violated or detail the evidence that spurred the investigation." *Nicksolat*, 2017 WL 4443410, at *4. Instead, "all that matters is that the customer be given notice of the thrust of the government's investigation, such that she has the opportunity to file a motion to quash." *Id.*

The subpoena and notice that SSA-OIG provided to Anomnachi appear on their face to comply with the RFPA. *See* ECF No. 1-1, at 9-12 (copy of subpoena and notice). But

7

Anomnachi once again contends that the subpoena incorrectly identifies the Deceased Beneficiary as his joint account holder, and asserts that this alleged error means the government has failed to comply with the statute. *See id.* at 6-7 (Anomnachi Aff. ¶¶ 25-26).

Once again, the discrepancy pressed by Anomnachi, even if real, does not support his claim. First, regardless of whether the subpoena properly identified the *other* joint account holder, there is no question that SSA-OIG gave *Anomnachi* notice that informed him of the nature of the investigation and identified the relevant account and the records sought. *See id.* at 9-12 (copy of subpoena and notice). Undoubtedly, he received "notice of the thrust of the government's investigation" and "opportunity to file a motion to quash." *Nicksolat*, 2017 WL 4443410, at *4.

Second, Anomnachi appears to argue that SSA-OIG did not comply with RFPA because the subpoena did not provide adequate notice to the *other* joint account holder – who he asserts is the Living Beneficiary. *See* ECF No. 1-1, at 7 (Anomnachi Aff. ¶ 26). The statute requires that notice be served on the "customer" of the financial institution. 12 U.S.C. § 3405(2). Moreover, "[e]ach customer listed on the account must be notified that the Government has requested access to his or her records." *United States v. Dowty*, 48 M.J. 102, 108 (C.A.A.F. 1998). As previously noted, the record is unclear regarding which of the beneficiaries is named on the account as Anomnachi's joint account holder. But whichever beneficiary is so listed, the Court concludes that SSA-OIG substantially complied with the statute.

Assuming that Anomnachi is correct and the Living Beneficiary is in fact named as his joint account holder, SSA-OIG accomplished substantial compliance though service of the subpoena and notice on Anomnachi himself. "Customer" is defined as "any person *or* authorized representative of that person" who used the financial services in question. 12 U.S.C.

§ 3401(5) (emphasis added). Therefore, the "customer" is notified so long as *either* the person who utilized the services *or* that person's representative is notified. In this case, Anomnachi states that he opened and operated the account in his capacity as guardian of the Living Beneficiary. *See* ECF No. 1-1, at 2-3 (Anomnachi Aff. ¶¶ 1, 11). While the RFPA does not define "authorized representative," Anomnachi was acting as the Living Beneficiary's "authorized representative" under any reasonable understanding of that term. *Cf. Russell v. Dep't of Air Force*, 915 F. Supp. 1108, 1116-20 (D. Colo. 1996) (finding that the Air Force qualified as an "authorized representative" under the RFPA in case where it opened credit card accounts for officer). Therefore, SSA-OIG effectively notified the Living Beneficiary when it notified his guardian, Anomnachi.

Alternatively, if the Deceased Beneficiary is listed as Anomnachi's joint account holder, the statute – reflecting common sense – does not require him to be notified. Nothing in the RFPA requires the government to notify a person who, though named on an account, died years before the account was opened. Such a person never "utilized . . . any service of a financial institution" in connection with the account, 12 U.S.C. § 3401(5), and therefore is not a "customer" requiring notice.

### III. Conclusion and Order

Accordingly, it is hereby **ORDERED** that Anomnachi's motion is **DENIED**, and that SSA-OIG may enforce its subpoena.

**SO ORDERED.**

/s/ Timothy J. Kelly  
TIMOTHY J. KELLY  
United States District Judge

Date: November 27, 2017